UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

V.  CRIMINAL ACTION NO. 3:24-CR-37-KHJ-ASH-1

JABREON DESHON MOSLEY

ORDER

Before the Court is Defendant Jabreon Deshon Mosley's [24] Motion to Suppress. For the reasons stated below, the Court denies the motion.

I.   Background

Around July 2023, a confidential citizen source told the East Mississippi Drug Taskforce that Mosley was pressing counterfeit pharmaceutical pills at his home, 2713 44th Avenue, Meridian, Mississippi. Search Warrant & Aff. [24-1] at 6, 13 n.12. Several months later, Mississippi Bureau of Narcotics (MBN) and Drug Enforcement Administration agents started a drug trafficking investigation in Meridian. *Id.* at 6. The investigation soon turned to Mosley. *Id.* So agents monitored conversations between Mosley and one of his distributors, known as Dealer-1. *Id.* at 7–15. A confidential source, known as CS-1, provided at least five recorded phone conversations to the agents. *See id.*[1] And investigators identified Mosley as a participant because the calls involved a phone number registered to his girlfriend at his address. *Id.* at 8 & n.3.

---

[1] CS-1 had "provided credible and truthful information in the past." [24-1] at 7.

In these conversations, Mosley and Dealer-1 used coded language to discuss trafficking methamphetamine, cocaine, and counterfeit pharmaceutical pills. *Id.* at 8–15. At one point, Mosley stated, "I was trying . . . to see if they could bring the cream down . . . . I can't find nobody to bring that shit away from Houston." *Id.* at 8 & n.4 (referring to methamphetamine as "cream"). He later told Dealer-1, "I better do the cream then you do the, um, girl, whatever. 'Boston' [a Boston-based source of supply] said you can be passing it out for what he get it for." *Id.* at 10 & nn.6–7 (cleaned up) (referring to cocaine as "girl"). Mosley also plainly spoke about "sling[ing] some of these . . . pills" as the "sound of a bag with numerous small contents being shaken [could] be heard in the background." *Id.* at 12. He then complained about having "so many of these bitches to count . . . ." *Id.*[2]

While surveilling Mosley's home in October, agents saw Dealer-1 and two others standing near a car parked by the home. *Id.* at 17. The three individuals were "looking at a clear plastic vacuum sealed bag" containing "more individual plastic bags," which "each further contain[ed] an unknown white substance." *Id.* When one individual spotted the agents, he tried to hide the bag in a cardboard box. *Id.* at 17–18. But based on their observations, the agents concluded that the plastic bag contained counterfeit pills. *Id.* at 17 n.22.

In January 2024, United States Customs and Border Protection intercepted a parcel addressed to Mosley at his home. *Id.* at 20. That parcel contained three "prescription pill press die molds" for manufacturing Xanax or Oxycodone tablets.

---

[2] These pills likely contained fentanyl and methamphetamine. [24-1] at 13 n.13.

2

*Id.* Using the information above, an MBN agent wrote an 18-page affidavit and applied for a warrant to search Mosley's home. *See id.* at 1–2, 5–22. In the affidavit's introduction, the agent stated that "[t]he information contained in this affidavit comes from my own personal knowledge of the investigation and from information provided by other investigating agents and officers as well as confidential sources (CS) who have proven reliable and credible in the past." *Id.* at 6.

A Lauderdale County circuit court judge issued the search warrant, and agents searched Mosley's home on January 18. *Id.* at 3–4; Gov't's Resp. [25] at 2. Within the home, they seized 2 pill presses, 55.45 pounds of methamphetamine, 40.99 pounds of fentanyl, 16.32 pounds of cocaine, 13 firearms, 1 suppressor, 3 cellphones, body armor, and $9,399. [25] at 2. Mosley now moves to suppress the evidence found in his home. *See* [24]. To that end, he contends that the agents obtained the warrant in bad faith and that the magistrate issued it without probable cause. *Id.* at 2, 7.

II.   Standard

The Fourth Amendment safeguards the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. If law enforcement officers violate the Fourth Amendment, the exclusionary rule—subject to several exceptions—generally bars the prosecution from introducing any evidence derived from that violation at trial. *Utah v. Strieff*, 579 U.S. 232, 237–38 (2016). On a motion to suppress, the movant

bears the burden, by a preponderance of the evidence, of showing that officers obtained the disputed evidence unconstitutionally and that the exclusionary rule applies. *See United States v. Turner*, 125 F.4th 693, 702, 712 (5th Cir. 2025).

A search occurs when law enforcement officers enter a home to gather evidence. *Collins v. Virginia*, 584 U.S. 586, 592–93 (2018). Typically, reasonableness requires officers to obtain a warrant from a neutral and detached magistrate before undertaking a search. *Riley v. California*, 573 U.S. 373, 382 (2014). Obtaining a warrant requires probable cause. U.S. Const. amend. IV. "Probable cause exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Turner*, 125 F.4th at 708 (cleaned up). To obtain a warrant, an officer must prepare an affidavit setting forth "particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." *Id.* at 710 (cleaned up).

Courts in the Fifth Circuit analyze warranted searches in two steps. *See id.* At step one, courts must determine whether the good-faith exception to the exclusionary rule applies. *Id.* Under the good-faith exception, courts do not exclude evidence when officers obtain it in "objectively reasonable reliance" on a warrant later found defective. *Davis v. United States*, 564 U.S. 229, 238–39 (2011) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)). If the good-faith exception applies, the inquiry ends. *Turner*, 125 F.4th at 710. "But if the exception does *not* apply," courts proceed to step two, where they must "determine whether the magistrate had

4

a substantial basis for finding probable cause." *Id.* (cleaned up). Accordingly, courts only suppress evidence obtained in a warranted search if the (1) good-faith exception does not apply and (2) the magistrate lacked a substantial basis for finding probable cause. *See id.*

III. Analysis

Mosley's [24] Motion to Suppress fails because the good-faith exception applies. The good-faith exception covers a multitude of deficient warrants. But even good faith cannot absolve warrants issued

> (1) when the issuing magistrate was misled by information in an affidavit that the affiant knew or reasonably should have known was false; (2) when the issuing magistrate wholly abandoned his judicial role; (3) when the warrant affidavit is so lacking in indicia of probable cause as to render official belief in its existence unreasonable; and (4) when the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that executing officers cannot reasonably presume it to be valid.

*United States v. Smith*, 110 F.4th 817, 839 (5th Cir. 2024) (cleaned up); *see also Leon*, 468 U.S. at 923. Mosley argues that the first three of these circumstances apply here. [24] at 7. They do not.

A. Misleading the Magistrate

Mosley claims that the agent preparing the warrant affidavit "knowingly misrepresented material facts which formed the basis for the application for the search warrant." *Id.* at 1. Courts must hold an evidentiary hearing if a movant makes a "substantial preliminary showing" that (1) the affiant deliberately or recklessly included false information in the warrant affidavit and (2) the false information underpinned the probable-cause finding. *Franks v. Delaware*, 438 U.S.

154, 155–56 (1978). Mosley has not made the required showing to obtain a *Franks* hearing for three reasons. First, he does not show that the warrant affidavit contains any false statements. Second, he offers no proof of deliberate or reckless falsity. And third, the affidavit establishes probable cause even without the allegedly false statements.

To obtain a *Franks* hearing, the movant must identify the affidavit's false statements, allege deliberate or reckless falsity, and support those allegations with an offer of proof. *Id.* at 171. "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Id.* If the movant makes the required showing, then courts excise the false statements and determine whether the rest of the affidavit would have established probable cause. *Turner*, 125 F.4th at 712. If not, then a court must hold a *Franks* hearing. *Franks*, 438 U.S. at 172.

To start, Mosley argues that the agent preparing the affidavit included the following false statement: "The information contained in this affidavit comes from my own personal knowledge of the investigation[] and from information provided by other investigating agents and officers as well as confidential sources (CS) who have proven reliable and credible in the past." [24] at 2 (cleaned up) (quoting [24-1] at 6); *see also id.* at 8–9. Grasping onto "the plural reference to confidential sources," Mosley asserts this statement is false because "the affidavit only contains information from a single confidential source"—CS-1. *Id.* at 2–3.

6

This argument is meritless. A careful reading of the affidavit reveals that investigators also "received information from a confidential citizen source . . . ." [24-1] at 13 n.12. That citizen source told agents that Mosley was pressing counterfeit pills in his home. *Id.* The agents later intercepted a package of three "prescription pill press die molds" addressed to Mosley, so the citizen source proved reliable. *Id.* at 20. Since the affidavit included information from at least two reliable sources, the Court finds the disputed statement true.

Mosley also complains that the affidavit characterizes the recorded calls provided by CS-1 as obtained from a "human resource" rather than "a piece of technical equipment . . . ." [24] at 6. But the affidavit does not mischaracterize the sources of its information. It explains that CS-1 provided agents with recorded phone calls and then includes transcriptions of the recordings. [24-1] at 8–15. This argument has no merit.

The Court could stop there. But even if the affidavit contained false statements, Mosley accuses the affiant of "knowingly misrepresent[ing] material facts" without any proof. [24] at 1. He fails to accompany this conclusory accusation with any affidavits or witness statements, and he does not explain his failure to provide them. *See id.* at 1–9; *see also Franks*, 438 U.S. at 171.

What's more, excising the affidavit's introductory mention of multiple sources does not affect the remaining 18 pages of facts, which provide ample support for the magistrate's probable-cause finding. *See* [24-1] at 5–22. The affidavit transcribes five conversations between Mosley and Dealer-1, in which they discussed trafficking

7

methamphetamine, cocaine, and counterfeit pills (likely containing fentanyl). *Id.* at 8 & n.4, 10 & n.6, 12, 13 n.13. In one conversation, Mosley mentioned "sling[ing] some of these . . . pills" while opening a pill bag and then complaining that he had "so many of these bitches to count . . . ." *Id.* at 12. This corroborated the citizen source's report that Mosley was pressing pills in his home. *Id.* at 12 n.13. And afterward, agents intercepted a package of pill-press molds addressed to Mosley and sent to his home. *Id.* at 20. These facts provided the magistrate a substantial basis for finding probable cause. *See Turner*, 125 F.4th at 708, 710.

B. Abandoning the Judicial Role

Mosley implies that the magistrate here "wholly abandoned his judicial role." *Smith*, 110 F.4th at 839 (cleaned up); *see* [24] at 7. A magistrate may wholly abandon the judicial role by serving as a rubber stamp for the police or acting as an adjunct law enforcement officer. *United States v. Cherna*, 184 F.3d 403, 408 (5th Cir. 1999). Even when a magistrate does "not fully perform his role," the good-faith exception applies if the magistrate "appear[s] to [the officers] to be doing so." *United States v. Breckenridge*, 782 F.2d 1317, 1321 (5th Cir. 1986). Mosley alleges nothing to support his conclusory accusation. *See* [24] at 1–9. He says only that "the issuing Judge lacked sufficient information and acted on misleading information when he approved the warrant." *Id.* at 6. This allegation—refuted by the litany of facts in the affidavit that establish probable cause—does not show that the magistrate failed to remain neutral or detached. This argument lacks merit.

    C. Issuing the Warrant on a "Bare Bones" Affidavit

Lastly, Mosley contends that the magistrate issued the warrant on a "bare bones" affidavit—that is, "an affidavit so lacking in probable cause as to render belief in its existence unreasonable." *United States v. Morton*, 46 F.4th 331, 336 (5th Cir. 2022) (en banc) (cleaned up); *see* [24] at 7. Such affidavits "contain wholly conclusory statements" such as "the affiant 'has cause to suspect and does believe' or 'has received reliable information from a credible person and does believe'" that contraband will be found. *Morton*, 46 F.4th at 337 (cleaned up).

    The affidavit here is "not of this genre." *Id.*; *see also* [24-1] at 5–22. As explained above, the affidavit is 18 pages long and "fully details the facts surrounding" Mosley's probable involvement in drug trafficking and manufacturing. *Morton*, 46 F.4th at 337; *see also* [24-1] at 5–22. In response, Mosley argues that the "affidavit provided no explanation on how the investigators identified [him] as . . . [a] party to any of the phone calls . . . ." [24] at 3. But the affidavit linked Mosley to one of the phone numbers used in the recorded calls. [24-1] at 8 n.3. That number was registered to Mosley's girlfriend at his address. *Id.* This supports the inference that Mosley used that phone number in the recorded calls. The affidavit is not "wholly conclusory." *Morton*, 46 F.4th at 337 (cleaned up). So this argument is also meritless.

9

IV.   Conclusion

For the reasons stated above, the Court DENIES Mosley's [24] Motion to Suppress. In doing so, the Court has considered all the parties' arguments. Those arguments not addressed would not have altered the Court's decision.

SO ORDERED, this 2nd day of May, 2025.

s/ *Kristi H. Johnson*
UNITED STATES DISTRICT JUDGE
